**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X   Case No.

ABIGAIL DOOLITTLE,

                            Plaintiff,

              -against-

BLOOMBERG L.P. and MARK CRUMPTON,

                       Defendants.

------------------------------------------------------------------------X

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiff, ABIGAIL DOOLITTLE ("Plaintiff"), by her attorneys, PHILLIPS & ASSOCIATES, PLLC, hereby complains of the Defendants BLOOMBERG L.P. and MARK CRUMPTON (collectively, the "Defendants"), as follows:

## NATURE OF THE CASE

1.    Plaintiff complains pursuant to **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"), the **New York State Human Rights Law**, NYS Executive Law § 296, *et seq*. ("NYSHRL"), and the **New York City Human Rights Law,** New York City Administrative Code § 8-107(1), *et seq.* ("NYCHRL")*,* and seeks damages to redress the injuries she has suffered as a result of being **discriminated and retaliated against** by Defendants due to her **gender** and **sex**.

## JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. §12101, *et seq*., and 28 U.S.C. §§ 1331 and 1343.

3.    The Court has supplemental jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this district in accordance with 28 U.S.C. § 1391(b) in that a substantial

part of the events or omissions giving rise to the claims occurred within the Southern District of New York.

## **PROCEDURAL PREREQUISITES**

5.    Plaintiff filed a Charge of Discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC").

6.    Plaintiff received a Notice of Right to Sue from the EEOC, dated July 26, 2022, concerning the herein charges of discrimination.  A copy of the Notice is annexed hereto.

7.    This Action is being commenced within ninety (90) days of receipt of said Notice of Right to Sue.

## **PARTIES**

8.    Plaintiff at all relevant times herein was and is a resident of the State of New York.

9.    At all relevant times herein, Plaintiff was and is a "person" and an "employee" entitled to protection by relevant federal, state and city laws referenced herein.

10.   Defendant Bloomberg L.P. ("Bloomberg") is a foreign limited partnership duly organized and existing under the laws of the State of Delaware, with a principal place of business located at 731 Lexington Avenue, New York, New York 10022.

11.   At all relevant times herein, Defendant Mark Crumpton ("Crumpton") was and is a male resident of the State of New Jersey.

12.   At all relevant times herein, Crumpton was and is a news reporter for Bloomberg's television network, "Bloomberg Television."

## FACTUAL ALLEGATIONS

13.   In or around 2015, Plaintiff began working for Bloomberg on a freelance basis, as a "Markets Correspondent/Segment Host" for Bloomberg Television.

14.   In or around 2016, based on her strong performance, Bloomberg made Plaintiff's position permanent and full-time.

15.   In that capacity, Plaintiff served as an on-air personality for the network, providing commentary on a variety of finance and business topics.

16.   Moreover, Plaintiff regularly worked with Crumpton, a seasoned reporter who has worked for Defendants for over thirty years.

17.   Initially, Plaintiff and Crumpton maintained a professional working relationship. However, beginning in or around December 2018, Crumpton started to sexually harass Plaintiff.

18.   For example, Crumpton repeatedly asked Plaintiff to go on vacation with him, stating, "Life would be a lot better if you and I were on a beach in the Caribbean together with a cocktail." Each time, Plaintiff declined Crumpton's invitation.

19.   Additionally, on multiple occasions throughout 2019, Crumpton told Plaintiff that her "earrings looked gorgeous."

20.   Crumpton also engaged in sexually inappropriate behavior towards other female employees at Bloomberg.

21.   For instance, in or around the Summer of 2020, Plaintiff and Crumpton were on-air when the station cut to a live segment hosted by Bloomberg's San Francisco-based Anchor,

Emily Chang.  Crumpton then seductively stared at the television that depicted Ms. Chang and made a sexually suggestive grunting noise.

22.    Based on his prior harassment, Plaintiff perceived Crumpton's actions to be sexually provocative and intended to indicate his attraction towards Ms. Chang.

23.    Additionally, on or about December 1, 2020, Crumpton approached Plaintiff and began telling a sexual joke about a doctor asking him to "drop his pants," which Plaintiff abruptly ended by telling him she did not want to hear it any further.

24.    Though Plaintiff was bothered by Crumpton's sexually inappropriate behavior, she did not initially complain about him because she feared that speaking out against a long-term male reporter would jeopardize her employment.

25.    Therefore, Crumpton continued to sexually harass Plaintiff.

26.    For example, on or about December 1, 2020, Plaintiff was live, on-air, when she noticed Crumpton seated across the newsroom, in her direct line of sight.  Moments into the broadcast, Crumpton stared directly at Plaintiff while masturbating his genitals over his pants.

27.    Immediately following the broadcast, Plaintiff complained to "Head of Terminal and Market Content," Daniel Curtis, that Crumpton was making her "uncomfortable," and insisted that she neither wanted to appear on-air with Crumpton, nor wanted him on set during her broadcasts.  Plaintiff did not specify the "masturbation incident" because, again, she feared retaliation based upon how other female media figures were treated after reporting harassment to their employers. Nevertheless, Mr. Curtis assured Plaintiff that he would address her concerns.  Mr. Curtis was aware of Crumpton's reputation for sexually

harassing behavior and knew that Plaintiff was complaining of Crumpton's sexually inappropriate behavior when she said she was "uncomfortable."

28. Despite her complaint, the next day, Bloomberg scheduled Plaintiff to go on-air with Crumpton. Not wanting to disrupt Bloomberg's live programming, Plaintiff was forced to worked alongside Crumpton for the remainder of the day.

29. On or about December 4, 2020, Plaintiff emailed Mr. Curtis, "[Crumpton] was on the set when I got out there yesterday. As I told you the other day, I am not comfortable sitting next to him on a set." Mr. Curtis replied that Plaintiff's then Executive Producer, Afternoon Programing, Emily Haas-Godsil, "Spoke with [Crumpton]. We should be all set." Mr. Curtis further stated, "[U]nfortunate it happened at all. Thank you for letting me know."

30. Crumpton then became enraged with Plaintiff after learning from Mr. Curtis and Ms. Haas-Godsil that Plaintiff complained about his behavior and began to retaliate against and intimidate Plaintiff.

31. For example, later that day, as Plaintiff was conducting a live broadcast, Crumpton aggressively charged the set to such a hostile degree that, former production assistant, Rafael (last name unknown), attempted to restrain Crumpton from entering the area (presumably because Defendants counseled Crumpton to cease harassing Plaintiff). However, determined to flaunt his apparent authority, his "untouchable status," and/or to intimidate Plaintiff, Crumpton pushed Rafael aside, entered the set, and sat in a chair next to Plaintiff as she finished her live broadcast.

32. Crumpton's actions were intended to intimidate Plaintiff from engaging in further protected activity and/or to retaliate against her for complaining about his sexual harassment.

33. Shortly after Plaintiff's broadcast, she emailed Mr. Curtis about Crumpton's hostile entrance to the set.  Specifically, she wrote that she was "100% uncomfortable on set" and that she "got off the set as fast as possible."  Mr. Curtis acknowledged Plaintiff's complaint and promised to speak with Ms. Haas-Godsil.  Later that evening, Mr. Curtis called Plaintiff and apologized for Crumpton's harassing behavior, telling Plaintiff, in sum and substance, I know [Crumpton] has done stuff like this in the past.  [Crumpton] has been instructed to avoid interaction with you both on set, and in the office.

34. Accordingly, for the next few weeks, Plaintiff did not have any overlapping airtime with Crumpton.  However, in or around January 2021, despite being instructed to avoid Plaintiff on set, Crumpton started to linger on set, specifically during Plaintiff's broadcasts.

35. Moreover, during these times, Crumpton intensified his sexually harassing behavior by continuously referencing employees as "cock suckers" and "sons of bitches," and blatantly "cat calling" other female employees, making statements such as "Well isn't she fine," in open space and in front of other employees, as they walked past him.  Crumpton defiantly "leveled up" his misconduct after Plaintiff complained about him to demonstrate to Plaintiff that he was "untouchable.

36. For the next several months, Crumpton began to regularly antagonize Plaintiff at work as a means to intimidate her and/or in retaliation for reporting him.

37. For example, on multiple occasions throughout February 2021, Crumpton feigned friendliness and greeted Plaintiff in the hallway of the office.  Each time Plaintiff did not respond, Crumpton sternly shouted, "I said hello!"  Given that Plaintiff previously complained about Crumpton's harassment to Mr. Curtis (and those complaints were

escalated to Ms. Haas-Godsil, who purportedly counseled Crumpton), Plaintiff reasonably believed that Crumpton's "greetings" were retaliatory and antagonistic

38.     Then, from March 2021 to June 2021, almost daily, Crumpton menacingly hovered near Plaintiff's desk while she worked, repeatedly lingered on set when he was not scheduled, and obsessively stared at Plaintiff during her live broadcasts.

39.     In fact, Crumpton's intimidation tactics became so overbearing that Plaintiff moved her desk in order to avoid him.

40.     On or about June 15, 2021, Plaintiff met with HR Business Partner, Rachel Parisee and Mr. Curtis and reported Crumpton's on-set "masturbation incident," as well as all of Defendant Crumpton's sexually harassing and retaliatory behavior throughout her employment. Unsurprisingly, Ms. Parisee replied, "I know about [Crumpton's] 'coffee talk' behavior on the newsroom." Ms. Parisee then told Plaintiff to escalate her complaints to Employee Relations Manager, Katherine Polis.

41.     Thus, on or about July 2, 2021, Plaintiff met with Ms. Polis and recounted all of the same sexual harassment and retaliation she previously reported to Ms. Parisee on June 15, 2021.

42.     In turn, rather than addressing Plaintiff's complaint, Ms. Polis asked Plaintiff how *she* wanted to resolve the issue. Plaintiff, not expecting to manage her own HR complaint, told Ms. Polis that she wanted Crumpton harassing behavior to stop. Ms. Polis then ended the meeting and told Plaintiff that she would follow-up in the near future.

43.     On or about July 12, 2021, Ms. Polis met with Plaintiff to further discuss her complaints. Ms. Polis then asked Plaintiff, "So all you want is for [Crumpton's] behavior to stop? Are you looking for us to fire him?" Again, unsure of how to manage her own complaint,

Plaintiff nervously replied, "I don't know, should I be considering something else?  Are there any other options?"  Ms. Polis simply dismissed Plaintiff's complaint, told Plaintiff that Defendants had a "No Retaliation Policy," and abruptly ended the meeting.

44.   Upon information and belief, multiple other female employees had complained about Crumpton's harassment prior to Plaintiff's complaint.

45.   Defendants then began to retaliate against Plaintiff for complaining about Crumpton's sexually harassing behavior.

46.   For example, that same week, Defendants drastically reduced Plaintiff's airtime from five to eight news segments per day, to four (or less) news segments per day.  By contrast, Crumpton saw no reduction in his airtime.

47.   Therefore, on or about July 16, 2021, Plaintiff emailed Ms. Polis:

> "I have never had a full week of being reduced like this to my memory … you can see how I would feel upset by this and connect our conversation as the turning point since before talking to you I had all my [segments] and this week I'm doing 60% less. I cannot help but feel like this was in retaliation for our conversation where I reported [Defendant CRUMPTON] pretending to touch his crotch on set along with all other flirtatious and inappropriate comments I told you about."

48.   On or about July 19, 2021, Ms. Polis replied to Plaintiff that Bloomberg would "investigate" her complaints of sexual harassment and retaliation against Crumpton.

49.   However, that same day, Crumpton continued to antagonize Plaintiff by smirking at her each time they crossed paths in the office, staring at her during live broadcasts, and by initiating loud and distracting conversations near her desk.

50.   Accordingly, later that evening, Plaintiff again emailed Ms. Polis and complained about Crumpton's continuous harassment.

8

51.    On or about July 21, 2021, Ms. Polis emailed Plaintiff that Bloomberg had concluded their "investigation" into her complaint and denied any wrongdoing on behalf of Crumpton.

52.    Later that day, Plaintiff called Ms. Polis to discuss the above purported "investigation." Ms. Polis then admitted that she *never* spoke with Crumpton about Plaintiff's complaint. Additionally, Ms. Polis instructed Plaintiff that she was not allowed to further complain about a Crumpton's sexually harassing behavior, unless he acted inappropriately again, *Plaintiff* confronted him on that behavior, and he again acted inappropriately in response. The call ended with Ms. Polis preaching to Plaintiff that rather than the company addressing Plaintiff's complaints, she should "use her voice against [Crumpton] to empower herself."

53.    In further retaliation for Plaintiff's complaint, in October 2021, Bloomberg removed another segment from Plaintiff's purview and directed Plaintiff to cease sending out the "morning note," which she regularly sent each morning to nearly three hundred (300) Bloomberg employees.

54.    Due to Bloomberg's failure to correct Crumpton's behavior and instead retaliate against Plaintiff, Crumpton was free to continue his harassment of Plaintiff, regularly entering her presence, on and off set, without legitimate reason in an effort to intimidate Plaintiff.

55.    On March 28, 2022, Plaintiff lodged another complaint to Ms. Polis regarding Crumpton's ongoing retaliatory harassment.

56.    In response to Plaintiff's complaint, on March 28, 2022, Ms. Polis refused to investigate Plaintiff's complaint, claiming that Crumpton was just doing his job. Moreover, Ms. Polis baselessly threatened Plaintiff that she was at risk of termination.

9

57.   As a result, nothing changed. Crumpton did as he had the past, freely harassing Plaintiff.

58.   In the eleven months following Plaintiff's complaint, Crumpton inserted himself into Plaintiff's space on more than eighty occasions, correlating to approximately once every four days she worked. This conduct included regularly standing around near Plaintiff's desk, making her unable to sit there, passing by the cameras while Plaintiff was on air, waiting for Plaintiff in the studio before she went on air, standing on set and staring her down while she was on air, generally making every effort to ensure that Plaintiff was made constantly uncomfortable by his presence.

59.   All of this behavior by Crumpton was condoned by Bloomberg, which repeatedly defended him and his right to intimidate Plaintiff.

60.   At the same time, Bloomberg continued to issue Plaintiff fewer on-air segments than she had prior to her complaints, with her total appearances cut by over fifty percent.

61.   The above are just some examples of the harassment, discrimination, and retaliation Plaintiff endured while working for Bloomberg.

62.   To date, Plaintiff continues to see an overall decrease in her scheduled airtime and Crumpton maintains free reign to interrupt her broadcasts and unnecessarily linger around her at work, regardless of her numerous previous complaints

63.   Defendants would not have harassed Plaintiff but for her sex/gender.

64.   Defendants would not have retaliated against Plaintiff but for her opposition to their unlawful conduct.

65.   Defendants' actions were intended to create a work environment that no reasonable person would tolerate.

66.     As a result of Defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

67.     As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress and physical ailments.

68.     As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

69.     As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages as against all Defendants, jointly and severally.

**FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER TITLE VII**
**(Against Bloomberg)**

70.     Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

71.     42 U.S.C. § 2000e-2(a)(1), states in part:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

72.     As described herein, Defendant discriminated against Plaintiff on the basis of her sex in violation of Title VII by creating, fostering, condoning, accepting, ratifying, and/or negligently failing to prevent or remedy a hostile work environment as described herein.

11

73.   As a result of the unlawful discriminatory conduct of the Defendant in violation of Title
      VII, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional
      distress, including, but not limited to depression, humiliation, embarrassment, stress and
      anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for
      which she is entitled to an award of monetary damages and other relief.

74.   The unlawful discriminatory actions of Defendant constitute malicious, willful, and wanton
      violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages
      under this statute and an award of punitive damages.

**SECOND CAUSE OF ACTION**
**FOR RETALIATION UNDER TITLE VII**
**(Against Bloomberg)**

75.   Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with
      the same force and effect as if more fully set forth herein.

76.   42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practice for an
      employer:

>   [T]o . . . discriminate against any of his employees . . . because he
>   has opposed any practice made an unlawful employment practice by
>   this subchapter, or because he has made a charge, testified, assisted
>   or participated in any manner in an investigation, proceeding, or
>   hearing under this subchapter.

77.   As described herein, Plaintiff engaged in protected activities, including but not limited to,
      making internal complaints regarding discrimination and retaliation to Defendant's staff.

78.   As described herein, after Plaintiff engaged in activities protected by Title VII, the
      Defendant took adverse actions against Plaintiff which would cause a reasonable employee
      from making or supporting a similar complaint of discrimination.

79.   Following Plaintiff's complaints, Plaintiff was subjected to an increasingly worse hostile

12

environment permeated with pervasive retaliatory behavior, as described herein.

80.    As a result of Defendant's retaliatory conduct in violation of Title VII, Plaintiff has

suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional

distress, including, but not limited to depression, humiliation, embarrassment, stress and

anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for

which she is entitled to an award of monetary damages, as well as past and future lost

wages and benefits and other compensatory damages, and other relief.

81.    Defendant's unlawful discriminatory actions constitute malicious, willful, and wanton

violations of Title VII, for which Plaintiff is entitled to the maximum allowable damages

under this statute and an award of punitive damages.

**THIRD CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE NYSHRL**
**(Against All Defendants)**

82.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above with

the same force and effect as if more fully set forth herein.

83.    Executive Law § 296(1)(a) provides that:

> It shall be an unlawful discriminatory practice: For an employer or
> licensing agency, because of an individual's age, race, creed, color,
> national origin, sexual orientation, military status, sex, disability,
> predisposing genetic characteristics, marital status, or domestic
> violence victim status, to refuse to hire or employ or to bar or to
> discharge from employment such individual or to discriminate
> against such individual in compensation or in terms, conditions or
> privileges of employment.

84.    As described herein, Defendants discriminated against Plaintiff on the basis of her sex, in

violation of NYSHRL, by creating, fostering, condoning, accepting, ratifying, and/or

13

negligently failing to prevent or remedy a hostile work environment as described herein.

85.     As a result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, economic loss, for which she is entitled to an award of monetary damages and other relief.

86.     As a result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, and emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

87.     Defendant Crumpton is also personally liable for leading, aiding and abetting the discriminatory practices endorsed by the Defendants.

88.     Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE NYSHRL**
**(Against All Defendants)**

89.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

90.     Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice for any
> person engaged in any activity to which this section
> applies to retaliate or discriminate against any person because
> he or she has filed a complaint, testified, or assisted in any
> proceeding under this article.

14

91.    As described herein, Plaintiff engaged in protected activities, including but not limited to, voicing, making internal complaints regarding discrimination on the basis of her sex.

92.    As described herein, after Plaintiff engaged in activities protected by the NYSHRL, Defendants took adverse employment actions against Plaintiff that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

93.    As a result of Defendants' retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer pecuniary losses, severe mental anguish and emotional distress, including, but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which she is entitled to an award of monetary damages, as well as past and future lost wages and benefits and other compensatory damages, and other relief.

94.    Defendant Crumpton is also personally liable for leading, aiding and abetting the retaliatory practices endorsed by the Defendants.

95.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

**FIFTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER THE NYCHRL**
**(Against All Defendants)**

96.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

97.    New York City Administrative Code §8-107(1) provides that It shall be an unlawful discriminatory practice:

> For an employer or an employee or agent thereof,
> because of the actual or perceived age, race, creed,
> color, national origin, gender, disability, marital status,
> sexual orientation or alienage or citizenship status of
> any person, to refuse to hire or employ or to bar or
> to discharge from employment such person or to
> discriminate against such person in compensation
> or in terms, conditions or privileges of employment.

98.    Defendants engaged in an unlawful discriminatory practice in violation of the New York

City Administrative Code §8-107(1)(a) by creating, fostering, condoning, accepting,

ratifying, and/or negligently failing to prevent or remedy a hostile work environment as

described herein.

99.    Defendant Crumpton is also personally liable for leading, aiding and abetting the

discriminatory practices endorsed by the Defendants.

100.    Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton

violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable

damages under this statute and an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**<u>FOR RETALIATION UNDER THE NYCHRL</u>**
**(Against All Defendants)**

101.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint as if more fully set forth herein at length.

102.    The New York City Administrative Code §8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter…"

103.    Defendants engaged in an unlawful discriminatory set of practices in violation of the

NYCHRL by discriminating and retaliating against Plaintiff for her opposition to the

16

unlawful employment practices of the Defendants and making internal complaints regarding discrimination and retaliation against her.

104.    Defendant Crumpton is also personally liable for leading, aiding and abetting the retaliatory practices endorsed by the Defendants.

105.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiff is entitled to the maximum allowable damages under this statute and an award of punitive damages.

## JURY DEMAND

106.    Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A.    Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, the NYSHRL, the NYCHRL, in that Defendants discriminated against Plaintiff on the basis of her sex and gender, and subjected her to a hostile work environment permeated with sexual harassment and retaliatory conduct against her;

B.    Awarding damages to Plaintiff resulting from Defendants' unlawful practices, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices

C.    Awarding Plaintiff compensatory damages related to injuries suffered as per Plaintiff's federal, state, and city-law claims;

D.    Awarding Plaintiff compensatory damages for mental, emotional and physical injuries, distress, pain and suffering and injuries to her reputation in an amount to be proven;

E.    Awarding Plaintiff punitive damages;

17

F.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the

        prosecution of the action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and

        proper to remedy the Defendants' unlawful employment practices.


Dated: Garden City, New York
       October 25, 2022

                                                **PHILLIPS & ASSOCIATES,**
                                                **ATTORNEYS AT LAW, PLLC**


                                                _____/s/_____
                                                Marjorie Mesidor
                                                585 Stewart Avenue, Suite 410
                                                Garden City, New York 11530
                                                T: (212) 248-7431
                                                F: (212) 901-2107
                                                mmesidor@tpglaws.com